IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 00-30966

Summary Calendar

_____


NANCY TANNER

                              Plaintiff - Appellant

        v.

LSU FIREMAN TRAINING PROGRAM; ALAN WALKER;
RUTH STEVENS

                              Defendants - Appellees

_____

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 97-CV-119-C
_____
May 18, 2001

Before KING, Chief Judge, and SMITH and PARKER, Circuit Judges.

PER CURIAM:[*]

      Plaintiff-Appellant Nancy Tanner appeals from the judgment

of the district court that dismissed her state-law retaliation

and 42 U.S.C. § 1983 claims against Defendants-Appellees

Louisiana State University Fireman Training Program, Alan Walker,

_____

      [*] Pursuant to 5TH CIR. R. 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

and Ruth Stevens.  For the following reasons, we AFFIRM in part, REVERSE in part, and REMAND.

## I. FACTUAL AND PROCEDURAL HISTORY

In this case, Plaintiff-Appellant Nancy Tanner sued Defendants-Appellees Louisiana State University Fireman Training Program ("LSU"), Alan Walker, and Ruth Stevens (collectively referred to hereinafter as the "Defendants") for allegedly retaliating against her for filing a sexual harassment complaint against one of her supervisors.  Tanner was employed by LSU in a Clerk 4 position.  She began her employment on March 7, 1994, and was terminated on January 23, 1996.

Prior to her employment with LSU, Tanner was an employee of the Department of Culture, Recreation and Tourism ("DCRT") as an administrative secretary.  Tanner began her employment with DCRT on March 22, 1992; however, she was discharged effective August 7, 1992, during the probationary period for that position.

On February 22, 1994, Tanner applied for a position with LSU.  On the application for the Clerk 4 position, Tanner listed her previous places of employment, including DCRT.  She stated that she left DCRT because the "position terminated."  In response to a question asking whether Tanner had "ever been fired from a job or resigned to avoid dismissal," Tanner answered "no."[2]

---

[2]    Relevant to her discharge from DCRT, Tanner testified to the following at trial: On August 6, 1992, she was summoned to a

2

After serving her probationary period at LSU, Tanner was made a permanent employee. Then, on November 3, 1995, Tanner and fellow employees Janet Mitchell and Tammy Davidson filed written complaints of sexual harassment against one of their supervisors, James Carroll.[3] As with all sexual harassment complaints, LSU's Human Resources Department assigned one of its employees to investigate the complainant's personnel file. Ruth Stevens was the employee assigned this task,[4] and Stevens testified at trial

_____

meeting with Alfred Trappey, the Assistant Secretary of DCRT, and Charmaine Washington, Tanner's immediate supervisor. At that meeting, Trappey gave Tanner a letter, which informed Tanner that her probationary employment was terminated because she "ha[d] not met the expectations of the department during [her] probationary period." Tanner questioned Trappey about the deficiencies in her performance at DCRT and received no response. Trappey informed Tanner that she could contact the Department of Civil Service if she had further questions. When she left Trappey's office, Tanner questioned Washington regarding the reasons for her discharge. Unsure of the answer, Washington went back into Trappey's office to inquire. When Washington returned, she informed Tanner that Tanner's position was being eliminated and that her duties were to be spread among other employees.

[3] Tanner testified at trial that Carroll would "hug on" and "grab on" the student workers in her department at LSU. Tanner stated that Carroll would often ask the women in the department to give him a "little kiss" and a "little T.L.C." Furthermore, Tanner observed Carroll lifting a female worker's dress and also adjusting another female worker's bra strap. Tanner explained that she was never sexually harassed; however, because she was one of the eldest employees, the student workers "looked up to" her. Moreover, she testified that Carroll's actions made her very uncomfortable. Therefore, Tanner testified that she and the two other female workers filed complaints against Carroll.

[4] In their "Statement of Facts," the Defendants allege that Stevens was reviewing Tanner's file in response to a grievance filed by Tanner against her supervisor, Carolyn Sharp. This grievance was filed on the same day as the sexual harassment

3

that it was the "regular procedure" of LSU to pull the personnel files of those individuals who file sexual harassment complaints.

In December 1995, Stevens began her review of Tanner's personnel file. During that review, Stevens discovered a discrepancy between DCRT's letter explaining why Tanner was terminated (i.e., she did not meet DCRT's expectations) and Tanner's reason for leaving DCRT (i.e., "position terminated").[5] Stevens took this information to Joan Thompson, the Assistant Director of Human Resources. As a result of this perceived discrepancy in Tanner's personnel file, on January 10, 1996, Thompson and Alan Walker, the Director of the LSU Fireman Training Program, issued a letter of intent to terminate Tanner's employment. The stated reason for termination was that Tanner "falsif[ied]" her application.

Tanner was given an opportunity to respond, and on January 12, 1996, she submitted a written explanation to Thompson and also presented letters in support of her response from Charmaine Washington and Myra Peak, Tanner's supervisors at DCRT.

---

complaint. Although Stevens testified that she was reviewing Tanner's file because of the grievance, her testimony also reflects that she reviewed Tanner's file in response to the sexual harassment complaint. We conclude that it is reasonable to draw an inference from the testimony on this issue in favor of Tanner, the nonmoving party. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000) (stating that in reviewing all of the evidence in the record, courts "must draw all reasonable inferences in favor of the nonmoving party").

[5]    See supra note 2.

Washington's and Peak's letters confirmed Tanner's submitted explanation that, while her termination letter from DCRT stated that she did not meet expectations, she was actually informed that her administrative secretary position at DCRT was being eliminated and that her duties were being distributed among the remaining DCRT employees. Despite Tanner's response and letters in support, LSU discharged Tanner.

On January 13, 1997, Tanner filed suit against the Defendants in Louisiana state court,[6] alleging violations of her rights under 42 U.S.C. § 1983, and retaliation under the Louisiana Human Rights Act, LA. REV. STAT. ANN. §§ 51:2231-51:2265 (West 1998),[7] and the Louisiana Employment Discrimination Law,

---

[6] Tanner also brought suit against Thompson. On April 22, 1998, however, Thompson moved pursuant to Federal Rule of Civil Procedure 4(m) to dismiss the suit against her because Tanner failed to serve her with process within the 120-day time limit. See FED. R. CIV. P. 4(m) (permitting the court to dismiss an action on its own initiative or upon a defendant's motion if the plaintiff fails to serve defendant within 120 days). A hearing on the matter was set for February 19, 1999. In her response to the Defendants' motion for summary judgment, Tanner admitted that she failed to serve Thompson within the time limit set out in Rule 4(m). There was no hearing on this issue, and the district court appears to have never formally dismissed Thompson from the suit. However, the district court's final judgment in this case addressed only LSU, Walker, and Stevens, and Tanner does not raise any issues with respect to Thompson on appeal. Therefore, we proceed as if Thompson is no longer a party to this case.

[7] Section 51:2231 states in pertinent part:

It is the purpose and intent of the legislature by this enactment to provide for execution within Louisiana of the policies embodied in the Federal Civil Rights Act of 1964, 1968, and 1972 and the Age Discrimination in Employment Act of 1967, as amended; and . . . to

LA. REV. STAT. ANN. § 23:1006 (West 1996).[8]  On February 14, 1997, the Defendants removed the suit to federal court based on federal question jurisdiction.  The case proceeded to trial by jury on June 12, 2000.  At the close of Tanner's case in chief, the

---

safeguard all individuals within the state from
discrimination because of race, creed, color, religion,
sex, age, disability, or national origin in connection
with employment and in connection with public
accommodations . . . .

LA. REV. STAT. ANN. § 51:2231(A).

[8]  Section 23:1006 provides in relevant part:

It shall be unlawful discrimination in employment for
an employer to:
  (a) Intentionally fail or refuse to hire, refer,
discharge, or to otherwise intentionally discriminate
against or in favor of an individual with respect to
compensation, terms, conditions, or privileges of
employment because of race, color, religion, sex,
disability as defined in R.S. 51:2232(11), or national
origin.
  (b) Intentionally limit, segregate, or classify an
employee in a way which would deprive an individual of
employment opportunities, give a favor or advantage to
one individual over another, or otherwise adversely or
favorably affect the status of an employee because of
race, color, religion, sex, disability as defined in
R.S. 51:2232(11), or national origin.

LA. REV. STAT. ANN. § 23:1006(B)(1).  Section 23:1006 was repealed
in 1997.  The current nondiscrimination statute is codified in
several sections of Title 23.  See LA. REV. STAT. ANN. §§ 23:321–
23:325 (disability), 23:332–23:334 (race, color, religion, sex,
and national origin), 23:341–23:342 (pregnancy, childbirth, and
related medical conditions) (West 1998 & Supp. 2001).  Because
Tanner filed suit before the August 1, 1997 effective date of the
current provisions, § 23:1006 governs this appeal.  See King v.
Phelps Dunbar, L.L.P., 98-1805, p.5 (La. 6/4/99), 743 So. 2d 181,
185.

Defendants moved for judgment as a matter of law. The district court granted the motion, dismissing all of Tanner's claims.

Tanner timely appealed.

## II. STANDARD OF REVIEW

We review de novo a district court's grant of a motion for judgment as a matter of law, applying the same standard as the district court. See Russell v. McKinney Hosp. Venture, 235 F.3d 219, 222 (5th Cir. 2000); see also Oden v. Oktibbeha County, Miss., --- F.3d ----, No. CIV.A.99-60878, 2001 WL 293511, at *5 (5th Cir. Mar. 27, 2001). "Judgment as a matter of law is appropriate if 'there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'" Russell, 235 F.3d at 222 (quoting FED. R. CIV. P. 50(a)). A district court may grant a motion for judgment as a matter of law only if the facts and inferences point so strongly in favor of one party that reasonable minds could not disagree. See Piotrowski v. City of Houston, 237 F.3d 567, 576 n.9 (5th Cir. 2001). In reviewing all of the evidence in the record, we "must draw all reasonable inferences in favor of the nonmoving party, and [we] may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); see also Russell, 235 F.3d at 222; Oden, --- F.3d at ----, 2001 WL 293511, at *5.

## III. STATE RETALIATION CLAIM AGAINST LSU

7

Because LA. REV. STAT. ANN. § 23:1006 is similar in scope to Title VII, 42 U.S.C. § 2000e et seq., Louisiana courts "have looked to federal jurisprudence to interpret Louisiana discrimination laws."  King v. Phelps Dunbar, L.L.P., 98-1805, p.7 (La. 6/4/99), 743 So. 2d 181, 187; see also Nichols v. Lewis Grocer, 138 F.3d 563, 566 (5th Cir. 1998) ("Courts have continually turned to federal employment discrimination law, including Title VII and the well-developed jurisprudence arising thereunder, for interpretation of Louisiana's anti-discrimination statute.").  In our evaluation of claims of retaliation in the workplace, this court employs the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).  See Haynes v. Pennzoil Co., 207 F.3d 296, 299 (5th Cir. 2000); cf. Greer v. Dresser Indus., Inc., 98-129, p.5 (La. App. 3 Cir. 7/1/98), 715 So. 2d 1235, 1238 (discussing the McDonnell Douglas framework for state-law discrimination cases).

To establish a prima facie case of retaliation, Tanner must demonstrate the following: (1) that she engaged in activity protected by Title VII, (2) that LSU took adverse employment action against her, and (3) that a causal connection exists between the protected activity and the adverse employment action. See Thomas v. Tex. Dep't of Criminal Justice, 220 F.3d 389, 394 (5th Cir. 2000); see also (Lee) Evans v. City of Houston, --- F.3d ----, No. CIV.A.99-20778, 2001 WL 277839, *5 (5th Cir. Mar. 21, 2001).  The district court concluded that it was undisputed

8

that Tanner demonstrated the first two elements, as she filed a sexual harassment complaint and was subsequently fired. However, instead of analyzing the evidence adduced by Tanner to determine if it was sufficient to establish whether there was a causal connection between Tanner's grievance filing and her discharge from LSU, the district court proceeded to determine whether LSU presented a legitimate, nonretaliatory reason for Tanner's discharge.

We conclude that Tanner's evidence establishes a prima facie case of retaliation. We agree with the district court that when Tanner filed her sexual harassment complaint against Carroll, she engaged in an activity protected by Title VII. See Haynes, 207 F.3d at 299; Collins v. Baptist Mem'l Geriatric Ctr., 937 F.2d 190, 193 (5th Cir. 1991). Moreover, there is no question that she was subjected to an adverse employment action, i.e., her discharge from LSU. See Mattern v. Eastman Kodak Co., 104 F.3d 702, 707 (5th Cir. 1997) (clarifying that "adverse employment actions" are "[u]ltimate employment decisions[, which] include acts such as hiring, granting leave, discharging, promoting, and compensating" (internal quotations and citations omitted)). Finally, although not resolved by the district court, we are satisfied that the evidence adduced by Tanner in her case in chief met the third element of her prima facie case. This court has held that "[c]lose timing between an employee's protected activity and an adverse action against [her] may provide the

9

causal connection required to make out a prima facie case of retaliation."  (Lee) Evans, --- F.3d at ----, 2001 WL 277839, at *7 (internal quotations omitted) (second alteration in original) (quoting Swanson v. Gen. Servs. Admin., 110 F.3d 1180, 1188 (5th Cir. 1997)).  However, in order to establish a causal connection via mere temporal proximity, the employer's adverse employment action must follow fairly soon after the employee's protected conduct.  See Fyfe v. City of Fort Wayne, 241 F.3d 597, 603 (7th Cir. 2001); see also Clark County Sch. Dist. v. Breeden, No. CIV.A.00-866, 2001 WL 402573, *3, — S. Ct. --- (Apr. 23, 2001) ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'").  As recognized by this court in (Lee) Evans v. City of Houston, four months has been found to be sufficient to demonstrate a causal connection.  See --- F.3d at ----, 2001 WL 277839, at *7.  In this case, Tanner submitted her harassment complaint on November 3, 1995, an investigation of her personnel file began within a month, and she was fired a little over a month later.  We conclude that this chain of events and short time lapse are sufficient to demonstrate the causal connection necessary to complete Tanner's prima facie case of retaliation.

With Tanner's prima facie case comes an inference of unlawful retaliation, see Blow v. City of San Antonio, Tex., 236 F.3d 293, 296-97 (5th Cir. 2001), and under McDonnell Douglas, the burden shifts to LSU to provide a legitimate, nonretaliatory reason for Tanner's discharge. See 411 U.S. at 802; Blow, 236 F.3d at 297. This is a burden of production and not persuasion. See Reeves, 530 U.S. at 142. LSU asserts that it discharged Tanner because of the discrepancy between her answers on her LSU employment application and the letter of discharge from DCRT. LSU contends that it has a "policy" of terminating employees for "falsifying" their applications. We conclude that this explanation satisfies LSU's burden of producing a legitimate, nonretaliatory reason for Tanner's discharge.

Because LSU produced a nonretaliatory reason for discharging Tanner, the presumption of retaliation created by Tanner's prima facie case "drops out of the picture" and the trier of fact must answer the "ultimate question": whether Tanner has demonstrated that LSU intentionally retaliated against her. See Russell, 235 F.3d at 222; see also Reeves, 530 U.S. at 143; (Leroy) Evans v. City of Bishop, 238 F.3d 586, 590 (5th Cir. 2000). To show that LSU intentionally retaliated against her, Tanner can rely on evidence that LSU's proffered reason was a pretext for unlawful retaliation, see Russell, 235 F.3d at 222, and the "trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . .

11

on the issue of whether the defendant's explanation is pretextual.'" Reeves, 530 U.S. at 143 (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255 n.10 (1981)); see also Russell, 235 F.3d at 222-23. Accordingly, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully [retaliated]." Reeves, 530 U.S. at 148.

The district court found that there was "absolutely no evidence whatsoever that the actions taken were a pretext for illegal retaliation against . . . Tanner." We disagree and, therefore, conclude that Tanner adduced sufficient evidence in her case in chief for a trier of fact to find that LSU's justification was false and that the evidence, combined with Tanner's prima facie case, was sufficient for her to survive judgment as a matter of law.

In response to her letter of termination, Tanner presented LSU with letters from two of her former DCRT supervisors, which appear to support Tanner's justification for indicating on her LSU employment application that she had never been fired. Tanner testified, and the letter written by Washington in support revealed, that Tanner had been informed that her position was being eliminated and her duties were to be distributed among the remaining employees in her department at DCRT. Moreover, and significantly, at the time Tanner was hired by LSU, the

12

discrepancy was noted, or "flagged," by the Department of Civil Service. Although Tanner's employment file remained at the Department of Civil Service, Stevens testified at trial that the Department of Civil Service must contact LSU regarding any "flags" and must also provide LSU with all of the information on an employee. Therefore, LSU was apparently aware of the discrepancy at the time of Tanner's hiring. The fact that LSU decided over one year and nine months after hiring Tanner and coincidentally subsequent to the filing of Tanner's sexual harassment complaint to act on the discrepancy further lends credence to Tanner's allegations of pretext.[9]

Moreover, after Tanner submitted the letters from Washington and Peak in support of her response, Stevens testified that, other than checking to see if Washington was still employed at DCRT, she made no other attempt at contacting Washington. It also appears that Peak was not contacted about her letter. A juror could reasonably conclude that, when discharging a permanent employee with an arguably valid explanation for the discrepancy that precipitated her firing, this investigation into the circumstances of her prior termination was inadequate.

---

[9] We also note that after her termination at LSU, Tanner again applied for civil service employment. She was contacted by the Louisiana State Police and asked to interview. After a background check, she was hired to the Gaming Division. Even with her termination from LSU for "falsifying her employment application," Tanner's civil service record still reflects that the Department of Civil Service deems her eligible for rehire.

13

Additionally, there is testimony in the record that may lead a reasonable trier of fact to conclude that LSU also failed to investigate adequately the complaint filed against Carroll. Tanner testified that after submitting a written statement regarding the sexual harassment, she received no further contact from LSU regarding her allegations. LSU did not indicate whether Carroll was disciplined or notify Tanner of the outcome of any investigation. Furthermore, Tanner testified that no one from LSU contacted her for any further information regarding the allegations in her complaint.

Tanner also testified that, after submitting the sexual harassment complaint, she, Mitchell, and Davidson were "scrutinized" by their office manager and that Tanner's immediate supervisor advised her that she could no longer speak to the student workers in her department. In addition, Tanner's supervisor began to require Tanner to submit a list of the certificates she had issued at the end of each working day; Tanner testified that she had never been required to do this prior to her submission of the sexual harassment complaint.

In sum, we make no credibility assessments nor do we weigh the evidence presented by Tanner in her case in chief; however, we do conclude that reasonable minds could debate whether this evidence, and the inferences that could be reasonably drawn therefrom, demonstrate that LSU's proffered justification for discharging Tanner was false and that LSU did, in fact, retaliate

14

against Tanner for submitting her sexual harassment complaint.
See Piotrowski v. City of Houston, 237 F.3d 567, 576 n.9 (5th
Cir. 2001) ("The district court properly grants a motion for
judgment as a matter of law only if the facts and inferences
point so strongly in favor of one party that reasonable minds
could not disagree.").  Because we believe that Tanner
established a prima facie case of retaliation and introduced
sufficient evidence for a trier of fact to reject LSU's reason
for her termination, and thus "infer the ultimate fact of
[retaliation] from the falsity of [LSU]'s explanation," Blow, 236
F.3d at 297, we conclude that the district court's grant of
judgment as a matter of law was improper.


**IV. SECTION 1983 CLAIM AGAINST WALKER AND STEVENS**

Tanner also contests the district court's conclusion that
Walker and Stevens were not liable under 42 U.S.C. § 1983.[10]
Regarding Walker, the district court found that there was "no
evidence whatsoever regarding anything that . . . Walker did in
connection with the acts that [Tanner] contends constituted

---

[10]  In her brief, Tanner asserts that, by "investigating her
and ultimately causing her termination," Walker and Stevens
violated the following rights: (1) her property right in her
public employment as a tenured civil servant, (2) her First
Amendment right of free speech, and (3) her right to engage in
"other concerted activities" for the "mutual aid or protection of
employees" under the National Labor Relations Act.

15

retaliation." The court determined that the evidence advanced by Tanner demonstrated only that Walker "occup[ied] the position that he occupied with L.S.U. at the time that these actions occurred." As to Stevens, the district court found that, at all times, Stevens worked under the direction of Thompson and reported all of her findings to Thompson. The court concluded that it was undisputed that Stevens took no part in the decision to terminate Tanner. Finding the evidence presented by Tanner to be legally insufficient to find liability on the part of either Walker or Stevens, the district court granted the Defendants' motion for judgment as a matter of law.

To state a cause of action under § 1983, a plaintiff must identify individuals "who were either personally involved in the constitutional violation or whose acts are causally connected to the constitutional violation alleged." Anderson v. Pasadena Indep. Sch. Dist., 184 F.3d 439, 443 (5th Cir. 1999); see also Murphy v. Kellar, 950 F.2d 290, 292 n.7 (5th Cir. 1992); Lozano v. Smith, 718 F.2d 756, 768 (5th Cir. 1983). After our review of the trial transcript, we agree with the district court that aside from Walker's supervisory position at LSU and his and Thompson's signatures on the termination letter, he had no other personal involvement with Tanner's termination. Instead, the testimony revealed that Thompson led the investigation and made the final decision to terminate Tanner. We also agree that Stevens, although the human resources employee who reviewed

16

Tanner's file, was merely following Thompson's explicit instructions and was at all times required to report to Thompson. The testimony revealed that Stevens was in no way involved in the decision to discharge Tanner, and Tanner has provided no evidence or argument to the contrary. As such, we conclude that neither Walker nor Stevens was personally involved in any alleged constitutional violations and neither person's acts were causally connected to the alleged violations.

In merely one page of briefing, Tanner conclusorily argues that she has a cause of action under § 1983 and points to rights that she claims are implicated. She cites no caselaw to support her claimed rights and provides absolutely no argument or facts demonstrating how any of Walker's and Stevens's alleged acts violated those rights. We agree with the district court that Tanner failed to provide sufficient evidence to demonstrate that either Walker or Stevens violated a right of Tanner's that is protected by federal or state law. As such, her § 1983 claims against these defendants fail.

## V. EXCLUSION OF EVIDENCE OF THE CIVIL SERVICE COMMISSION DECISION

Finally, Tanner argues that the district court abused its discretion in excluding evidence of the Civil Service Commission's (the "Commission") decision regarding LSU's lack of cause to terminate Tanner. Tanner contends first that the

17

evidence was "clearly relevant" to the issue whether LSU's justification for discharging her was pretext. Next, Tanner asserts "[n]ot only should the Commission decision have been allowed into evidence, the defendants should have been [collaterally] estopped from arguing that the proffered reason for termination was in fact made in good faith or for cause." We disagree with each of Tanner's arguments.

This court reviews a district court's evidentiary rulings under an abuse of discretion standard. See Battle v. Mem'l Hosp. at Gulfport, 228 F.3d 544, 550 (5th Cir. 2000). Under Federal Rule of Evidence 103(a), an error in the exclusion of evidence is not grounds for reversal unless substantial rights are affected. See FED. R. EVID. 103(a); Reddin v. Robinson Prop. Group Ltd. P'shp, 239 F.3d 756, 759 (5th Cir. 2001). Furthermore, we review a district court's decision to apply collateral estoppel for an abuse of discretion. See Aquillard v. McGowen, 207 F.3d 226, 228 (5th Cir.), cert. denied, 121 S. Ct. 184 (2000).

After her termination from LSU, Tanner appealed her discharge to the Commission. After reviewing the record of a hearing held by a referee, the Commission determined that LSU did not have cause to discharge Tanner. The Commission took judicial notice of the fact that the phrase "fired from a job," as was used on LSU's employment application, is a "colloquialism for having been involuntarily removed from a job because of fault" and determined that it appeared to be "very reasonable for

18

[Tanner] to conclude that she had not been removed from DCRT because of her fault." The Commission ultimately concluded that LSU had failed to demonstrate that there was "cause for any action against [Tanner]."

The district court determined that the Commission's findings were not relevant to the issue whether LSU retaliated against Tanner. The district court also stated that "to admit the evidence, I think, would run into the teeth of [Federal Rule of Evidence] 403, in that not only would the evidence have to be introduced, but then the jury would also have to be instructed, or admonitions would have to be given as to whatever limited purpose would be served by this evidence."

We conclude that the district court was within its discretion in refusing to admit evidence of the Commission's decision. The Commission was not presented with the issue before the district court, i.e., whether LSU retaliated against Tanner for engaging in protected conduct. Therefore, we believe the district court could fairly conclude that the evidence of its decision was not relevant to the issue at hand and that, if the evidence had any probative value at all, it was substantially outweighed by prejudice and the complications involved in explaining the limited purpose of the evidence to the jury. See FED. R. EVID. 403; see also Campbell v. Keystone Aerial Surveys, Inc., 138 F.3d 996, 1004 (5th Cir. 1998) ("'A district court has broad discretion in assessing admissibility under Rule 403,' and

19

we review only for an abuse of that discretion." (alteration omitted) (quoting United States v. Morris, 79 F.3d 409, 411 (5th Cir. 1996))).

As for Tanner's collateral estoppel argument, LSU asserts that Louisiana law does not recognize the doctrine. Admittedly, Louisiana courts are not of one mind regarding whether collateral estoppel exists under the law of their state. While it appears that many Louisiana courts have traditionally declined to recognize collateral estoppel, it also appears that other courts have concluded that a 1990 amendment to Louisiana's res judicata statute subsumed the doctrine. See LA. REV. STAT. ANN. § 13:4231 (West 1991). Compare Steptoe v. Lallie Kemp Hosp., 93-1359, p.6 (La. 3/21/94), 634 So. 2d 331, 335 ("[C]ollateral estoppel or issue preclusion is not a valid Louisiana defense[.]"), Avenal v. Louisiana, 99-0127, p.4 (La. App. 4 Cir. 3/3/99), 757 So. 2d 1, 11 (on application for reh'g) ("Louisiana law, which clearly pertains to the state law claims in this case, does not recognize the doctrine of collateral estoppel."), and Diez v. Daigle, 96-1174, p.5 (La. App. 4 Cir. 12/27/96), 686 So. 2d 966, 969 ("To the extent that the trial judge relied on the doctrine of collateral estoppel in reaching his decision, that was error. Although defendants cite numerous federal cases in support of that position, Louisiana law, for whatever reason, has steadfastly refused to accept that doctrine."), with LA. REV. STAT. ANN. § 13:4231 cmt. b ("R.S. 13:4231 also changes the law by

20

adopting the principle of issue preclusion."), and Hudson v. City of Bossier, 33,620, p.7 (La. App. 2 Cir. 8/25/2000), 766 So. 2d 738, 743 ("La. R.S. 13:4231 embraces the broad usage of the phrase 'res judicata' to include both claim preclusion (res judicata) and issue preclusion (collateral estoppel)."). However, we need not resolve the question whether collateral estoppel is a valid doctrine in Louisiana because, even assuming the doctrine exists under Louisiana law, Tanner's collateral estoppel argument misses the mark.

"Under issue preclusion or collateral estoppel, . . . once a court decides an issue of fact or law necessary to its judgment, that decision precludes relitigation of the same issue in a different cause of action between the same parties." Hudson, 33,620 at p.7, 766 So. 2d at 743 (emphasis added). As noted above, the issue of cause as determined by the Commission is not the same as the issue whether LSU's proffered reason for Tanner's discharge was in fact made in good faith and not a pretext for retaliation. Moreover, the Commission did not address LSU's alleged good faith or reasonable belief that Tanner falsified her application. Therefore, because the Commission's conclusion regarding Tanner's reasonable belief as to her termination from DCRT does not correspond to the issue that was before the district court, the district court did not abuse its discretion in not according the decision preclusive effect.

21

## VI. CONCLUSION

The district court's judgment granting the Defendants' motion for judgment as a matter of law on Tanner's § 1983 claim is AFFIRMED. However, we REVERSE the district court's judgment granting the Defendants' motion for judgment as a matter of law on Tanner's state-law retaliation claim and REMAND for further consideration. Because we affirm the district court's judgment as to Tanner's federal claim, the district court may exercise its discretion in determining whether to retain Tanner's state-law claim or to dismiss it without prejudice so that Tanner may file it in state court. See 28 U.S.C. § 1367(c). Each party shall bear its own costs.